NOT DESIGNATED FOR PUBLICATION

No. 119,118

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of W.S.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed September 28, 2018. Affirmed.

*Christopher Cuevas*, of Kansas City, for appellant natural mother.

*Ethan Zipf-Sigler*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before BUSER, P.J., GREEN and ATCHESON, JJ.

PER CURIAM: C.Y. appeals the ruling of the Wyandotte County District Court terminating her right to parent W.S., her son. She contends the State produced insufficient evidence that she was an unfit parent or that W.S.'s best interests would be served by severing their relationship. The evidence established C.Y. failed to obtain suitable housing, lacked regular employment, and never developed basic parenting skills over the 16-month course of the case despite the ongoing efforts of social service agencies and caseworkers. We find no legal error in the district court's decision and affirm.

1

C.Y. was 19 years old when she prematurely gave birth to W.S. in mid-October 2016. Because W.S. was born early and underweight, he remained in a local hospital. During that time, C.Y. and the putative father were unable to adhere to the feeding schedule for W.S. C.Y. also was unwilling or unable to diaper and otherwise care for W.S. Hospital staff believed C.Y. might be intellectually impaired, inhibiting her ability to parent W.S. safely or successfully.

After receiving a report on the situation, the Kansas Department for Children and Families intervened in early November 2016 and took custody of W.S. The State then filed a petition in the district court to have W.S. declared a child in need of care. Social service agencies and caseworkers developed a plan that would permit C.Y. to regain custody of W.S. and to go forward with him as an integrated family unit. The plan required C.Y. to meet various objectives designed both to impart skills so she could adequately parent W.S. and to develop a nurturing home environment in which she could apply those skills.

Ultimately, the district court determined those efforts to mold C.Y. and W.S. into a viable family unit had failed. The State filed a motion to terminate C.Y.'s parental rights. The district court held an evidentiary hearing on the termination motion in February 2018. The evidence showed that in the 16 months between DCF's intervention and the termination hearing:

• C.Y. had identified several men as possibly being W.S.'s father. Paternity testing had excluded all of them. At the hearing, C.Y. disclaimed knowing who might be the father, given the test results.

• C.Y. failed to maintain suitable housing. She first lived with one of the men she believed to be W.S.'s father. She briefly lived with her own father. She then moved in with a new boyfriend for about four months in early 2017. During that time, C.Y. had no contact with W.S. and limited contact with her assigned caseworkers. After the boyfriend became physically abusive, C.Y. moved back with her father and continued to live with him at the time of the termination hearing.

• C.Y. had intermittent employment at a fast food restaurant and at an area hotel. She had lost the hotel job and was looking for work at the time of the termination hearing. Even when C.Y. was working, the evidence didn't establish she earned enough to support herself and W.S. She was financially dependent upon her father.

• C.Y.'s principal caseworker concluded that C.Y. and W.S. had not bonded. C.Y. never progressed beyond relatively short supervised visits with W.S., and he didn't really recognize her as his mother. According to the caseworker, W.S. was doing well in a foster placement and connected more with the foster family. Despite parenting classes and coaching, C.Y. failed to develop basic skills and failed to appreciate taking fairly simple steps for W.S.'s safety, such as removing objects he might put in his mouth or not leaving him alone on a sofa after he started rolling over.

• Psychological testing and an evaluation by a licensed social worker showed that C.Y. functioned intellectually in a low-normal range. C.Y. did not follow up on a recommendation for a neuropsychological examination. The caseworker found C.Y.'s father to be domineering and controlling, often intrusively interfering in status visits and interviews. The caseworker concluded that the home environment with C.Y.'s father would not be suitable for W.S.

C.Y.'s father loomed as an enigmatic and decidedly sinister presence in this case, although he did not testify at the termination hearing. C.Y. had alleged and recanted on at

3

least several occasions that her father had raped her when she was much younger. In 2017, C.Y. filed for a protection from stalking order in which she repeated those allegations against him and stated he had recently raped her. At the termination hearing, C.Y. testified that her father sometimes becomes violent with her and had raped her years earlier. She denied he had sexually abused her recently. C.Y. testified that she had been fearful that her father might physically abuse W.S. but no longer felt that way.

In reviewing the evidence at the close of the termination hearing, the district court characterized C.Y.'s father as "an abusive, controlling, dangerous, and sexually violent person." The district court stopped short of making an explicit finding that C.Y.'s father had raped her. But the district court also said circumstantial evidence suggested C.Y.'s father might well be W.S.'s father and no genetic testing had been done to rule out that possibility.

In a journal entry, the district court found by clear and convincing evidence that C.Y. was statutorily unfit as a parent because "reasonable efforts" by the involved social service agencies had been "unable to rehabilitate the family," as provided in K.S.A. 2017 Supp. 38-2269(b)(7), and because C.Y. had made insubstantial efforts "to adjust [her] circumstances, conduct or conditions to meet the needs of" W.S., as provided in K.S.A. 2017 Supp. 38-2269(b)(8). The district court similarly found those conditions were unlikely to change in the foreseeable future. And the district court concluded that W.S.'s best interests would be served by terminating C.Y.'s parental rights. C.Y. has appealed, challenging the sufficiency of the evidence supporting each of those determinations.

LEGAL ANALYSIS

A parent has a constitutionally protected liberty interest in the relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 759-60, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the

4

inherent importance and unique character of that relationship, the right has been deemed fundamental. Accordingly, the State may extinguish the legal bonds between parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2017 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

As provided in K.S.A. 2017 Supp. 38-2269(a), the State must prove the parent to be unfit "by reason of conduct or condition" making him or her "unable to care properly for a child" and that the circumstances are "unlikely to change in the foreseeable future." The statute contains a nonexclusive list of nine conditions that singularly or in combination would amount to unfitness. K.S.A. 2017 Supp. 38-2269(b). And the statute lists four other factors to be considered if a parent no longer has physical custody of a child. K.S.A. 2017 Supp. 38-2269(c).

In reviewing a district court's determination of unfitness, an appellate court must be convinced, based on the full evidentiary record considered in a light favoring the State as the prevailing party, that a rational fact-finder could have found that decision "highly probable, *i.e.*, [supported] by clear and convincing evidence." *In re B.D.-Y.*, 286 Kan. at 705. The appellate court cannot weigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705. In short, any conflicts in evidence must be resolved to the State's benefit and against C.Y.

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). As directed by the language of K.S.A. 2017 Supp. 38-2269(g)(1), the district court gives "primary consideration to the physical, mental[,] and emotional health of the child." The district court makes that determination based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The best-interests issue is essentially entrusted to the district court acting within its sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of decisions for abuse of discretion. A district court

5

exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

Here, as we have pointed out, the district court found C.Y. to be unfit based on the two statutory grounds set forth in K.S.A. 2017 Supp. 38-2269(b)(7) and (b)(8). As to the first, the evidence shows social service agencies and caseworkers actively tried to engage C.Y. in various programs and opportunities to rehabilitate the family unit. Early on, C.Y. refused to have any contact with W.S.—a choice that undoubtedly inhibited the development of a familial relationship, especially since W.S. had been in state custody almost from birth. Later, C.Y. failed to demonstrate parenting skills sufficient to allow any extended or unsupervised visits with W.S., further inhibiting the mother-child relationship.

Over the 16 months W.S. had been a ward of the State, C.Y. experienced extended periods of unemployment and was jobless at the time of the termination hearing. The record failed to show C.Y. could sustain sufficiently remunerative employment to support W.S. Similarly, C.Y. never acquired suitable housing for W.S. For most of the time, she lived either with a boyfriend in a relationship that became abusive and ultimately failed or with her father. For the reasons the district court found, a household in which C.Y.'s father resided would have been unsuitable for W.S. (But for extraordinary necessity, it is hard to see how it was even marginally suitable for C.Y. alone.) On appeal, C.Y. does not cite evidence that the social service agencies somehow neglected her or failed to make available adequate training, counseling, or other rehabilitative services.

The same circumstances bear on the second statutory ground. C.Y. simply lacked the wherewithal to change to the degree necessary to obtain regular employment and to

acquire adequate housing for herself and W.S. Rather, she remained financially and emotionally bound to her father in a destructive relationship she described at the hearing as having been violent and sexually abusive.

From the evidence, we must conclude a rational fact-finder could determine to a high probability that C.Y. was unfit to parent W.S. at the time of the termination hearing in the ways the district court identified. Without belaboring the evidence, we find like support for the district court's determination that C.Y.'s unfitness was unlikely to change in the foreseeable future. The evidence essentially showed that C.Y. had literally made no progress during the 16 months between W.S.'s birth and the termination hearing. She remained unemployed and living with her father with no tangible expectation that those circumstances would change anytime soon. C.Y. didn't develop any sort of extended relationship with W.S. and couldn't master basic parenting skills to meet the needs of an infant or a toddler. Again, nothing in the evidence suggested C.Y. was headed toward materially correcting those deficiencies even well beyond the horizon.

In gauging the foreseeable future, the courts should use "child time" as the measure. As the Revised Kansas Code for Care of Children, K.S.A. 2017 Supp. 38-2201 et seq., recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that different perception typically points toward to a prompt, permanent disposition. K.S.A. 2017 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's"). Here, that factor takes on particular significance, given W.S.'s very young age and the lack of any real parental relationship between him and C.Y.

Finally, we consider the district court's finding that W.S.'s best interests would be served by terminating C.Y.'s parental rights. Our standard of review on this point is considerably more deferential to the district court. We perceive no shortcomings in the district court's assessment of the evidence or the applicable legal principles. The remaining component of the abuse of discretion standard simply asks whether no reasonable district court would come to the same conclusion under comparable circumstances. And we simply answer other district courts would. Here, as we have stated, the evidence shows C.Y. had a limited relationship with W.S., so the emotional impact on W.S. in severing that relationship would be commensurately curtailed. Conversely, the upheaval to W.S. in removing him from a foster family and placing him in what can only be described as a psychologically toxic environment with C.Y. and her father—and one in which he potentially could witness or experience physical abuse— would be markedly adverse to his best interests.

We find the district court acted well within the evidence and the law in terminating C.Y.'s parental rights with respect to W.S.

Affirmed.